UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


CHAKA PETERS,                          :
                                       :    NO. 1:10-CV-906
          Plaintiff,                   :
                                       :
                                       :    **OPINION & ORDER**
                                       :
     v.                                :
                                       :
                                       :
UNIVERSITY OF CINCINNATI               :
COLLEGE OF MEDICINE                    :
                                       :
          Defendant.                   :


This matter is before the Court on Defendant's Motion for Summary

Judgment (doc. 22), Plaintiff's Response in Opposition (doc. 25),

and Defendant's Response in Support (doc. 27).  For the following

reasons, the Court DENIES Defendant's motion (doc. 22).

**I.   BACKGROUND**

This case arises out of the University of Cincinnati College of

Medicine's decision to dismiss Plaintiff, who was a medical

student, from its program.  Plaintiff is a Middlebury College

alumna, from which she graduated after six years and a number of

academic failures with a dual degree in Biology and Psychology.

Her grades were not good enough to get her into medical school

right away, but after completing a graduate program in Molecular,

Cellular and Developmental Biology, she enrolled in Defendant's

medical studies program in the fall of 2004.

Her academic struggles started almost immediately, and she sought out an individual tutor, used Defendant's group tutoring services, and sought help from a cognitive psychologist. She nonetheless did not pass three of the six courses in her first quarter, was placed on academic probation and was referred to the Senior Associate Dean of Student Affairs and Admissions for academic counseling. Laura Wexler, to whom Plaintiff was referred, is not a psychiatrist but nonetheless decided that Plaintiff was clinically depressed, was the victim of "battered woman syndrome," and had "kind of retarded speech." She encouraged her to seek help from a University psychiatrist and from the Assistant Dean for Academic Support. Plaintiff followed these recommendations and was given medication for depression, which helped with some of the depressive symptoms but did not affect her academic abilities. She did, however, complete her first year, after taking a summer course.

Over the course of the next year, Plaintiff continued to seek help but was recommended for dismissal because she did not meet the academic requirements of the second year. It was suspected that Plaintiff had a non-verbal learning disability and Attention Deficit Disorder ("ADD"), but treatment for the ADD was not recommended because it was determined that her depression should

be controlled first. The Appeals Board did not vote to dismiss Plaintiff from the program because it recognized that Plaintiff had only recently begun treatment for her Seasonal Affective Disorder and that ADD and a nonverbal learning disability were both treatable conditions. Dean Stern agreed with the Appeals Board, and Plaintiff re-enrolled as a second year student with certain conditions.

Plaintiff continued therapy and medication for her depression and, although she still had problems focusing and concentrating, she passed each of her second year courses. Her academic struggles continued into her third year; she was very successful in some components of her studies but scored poorly on her exams. Although she continued to seek and receive help for depression, she did not believe that depression was the obstacle to her academic success. After returning from a leave of absence, Plaintiff was informed that she would have to take a Radiology exam (which she had been unable to take earlier due to illness) and a remedial Surgery exam (because she had failed that exam) during the Winter Break, and, because she was required to earn a certain number of credits within a 12-month time frame, she had to immediately begin a Pediatrics Core Clerkship.

Shortly thereafter, the psychiatrist who had been managing Plaintiff's care retired, and Plaintiff's new psychiatrist

immediately suspected that Plaintiff had a learning disorder. She was referred to a Dr. Krikorian, a psychologist at the University, who performed a series of assessments and determined that Plaintiff suffered from ADD. He also believed that the ADD had gone undiagnosed for so long because Plaintiff's depression overshadowed it, but it was his opinion that the depression and anxiety she suffered were actually secondary effects of the ADD. Dr. Krikorian concluded that Plaintiff's ADD had significantly limited her ability to function successfully in medical school but that, with treatment, she should be able to improve satisfactorily. He prescribed Plaintiff medication for her ADD and recommended that she be given extra time for her exams. Defendant, however, required Plaintiff to take her Pediatrics exam before the end of 2008, and she sat for the exam shortly after beginning her medication regimen. She failed the exam by two points, and she was recommended for dismissal as a result. During the pendency of her appeal of that decision, Plaintiff took four more exams, each of which she passed. Dr. Krikorian attributed her success to her medication regimen, which had stabilized by the time she sat for those exams. At her appeal, Plaintiff presented evidence that her medication regimen had not been stabilized at the time she took her Pediatrics exam and asked that, now that it had been stabilized—which resulted in

improved exam performance-she be allowed to retake the exam. Dr. Krikorian attested to his ADD diagnosis and to the likelihood of Plaintiff succeeding in school if properly treated, and he urged Defendant to "reconceptualize" Plaintiff's issues that had previously been attributed to depression and anxiety.

Despite the evidence before it, the Appeals Board denied her appeal, having decided that Plaintiff's history of depression and "ups and downs and cycling" would prevent her from sticking to a regimen that would allow her to be a good physician. Dean Stern, who had unfettered discretion to adopt or reject the Appeals Board's decision, affirmed the decision because, he stated, Plaintiff suffered from a "pattern of academic and psychiatric difficulties." Plaintiff was thus finally terminated from Defendant's program.

Plaintiff sued Defendant for discrimination on the basis of disability. Specifically, she claims that Defendant violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act when it refused her request to accommodate her ADD by allowing her to retake her pediatrics exam; that Defendant violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act when it dismissed Plaintiff from its program because of her ADD; and that Defendant violated Title II of the Americans with

Disabilities Act and Section 504 of the Rehabilitation Act when it dismissed Plaintiff from its program because it regarded her as disabled (doc. 1).

Defendant moved for summary judgment, and the matter is ripe for the Court's decision.

**II. STANDARD**

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464 (1962); <u>LaPointe v. United Autoworkers Local 600</u>, 8 F.3d 376, 378 (6th Cir. 1993); <u>Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs.</u>, 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Fatton v. Bearden</u>, 8 F.3d. 343, 346 (6th Cir. 1993), <u>quoting</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 251-252 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary

judgment and the respective burdens it imposes upon the movant and non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact [.]" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see also</u> <u>LaPointe</u>, 8 F.3d at 378; <u>Garino v. Brookfield Township Trustees</u>, 980 F.2d 399, 405 (6th Cir. 1982); <u>Street v. J.C.D. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. <u>See</u> <u>Barnhart v. Pickrel, Shaeffer & Ebeling Co. L.P.A.</u>, 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. <u>See</u> <u>Celotex</u>, 477 U.S. at 317; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of <u>material</u> fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly

supported motion for summary judgment." Anderson, 477 U.S. at 247-248 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-340 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp.,

898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991).

**I I I .       T h e       T h r e s h o l d       I s s u e s**

Title II of the ADA and Section 504 of the Rehabilitation Act (the "RHA"), under which Plaintiff brings her claims, prohibit discrimination on the basis of disability. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in

or be denied the benefits of services, programs, or activities of a public entity, or be subject to discrimination by such an entity." 42 U.S.C. § 12132. Similarly, the RHA provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Although the RHA and the ADA are not identical, the Sixth Circuit has held that "because the purpose, scope, and governing standards of the acts are largely the same, cases construing one statute are instructive in construing the other." <u>Doe v. Woodford County Bd. of Educ.</u>, 213 F.3d 921, 925 (6th Cir. 2000)(<u>quoting</u> <u>McPherson v. Mich. High School Athletic Ass'n, Inc.</u>, 119 F.3d 453, 460 (6th Cir. 1997))(internal quotation marks omitted).

Plaintiff claims that she was discriminated against either because of her disability or because she was regarded as having a disability, in violation of both the ADA and the RHA (doc. 1). Under the ADA and the RHA, the elements of a claim are essentially the same: (1) Plaintiff must be a person with a disability; (2) she must be "otherwise qualified" for participation in the relevant program; and (3) she must be excluded from participation in or denied the benefits of that

program or otherwise subjected to discrimination by reason of her disability.[1]  However, while the two statutes are similar in scope and purpose and generally subject to the same standards, they differ with respect to the standard used to determine causation.  Specifically, to prevail on a claim of disability discrimination under the ADA, Plaintiff must establish that: that (1) she is disabled, (2) she is qualified to perform the requirements of the College of Medicine with or without reasonable accommodation, and (3) she would not have been dismissed <u>but</u> <u>for</u> her disability.  <u>See</u> <u>Lewis v. Humboldt Acquisition Corp.</u>, 681 F.3d 312 (6th Cir. 2012)(en banc)(emphasis added); <u>Donald v. Sybra, Inc.</u>, 667 F.3d 757, 763 (6th Cir. 2012). In contrast, to prevail under the RHA, a plaintiff alleging disability discrimination must show that the adverse action was taken <u>solely</u> because of a disability.  <u>See</u> 29 U.S.C. § 794(a)("No otherwise qualified individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....").  Plaintiff seeks

_____
[1]    The RHA also requires that the plaintiff show that the defendant is an entity receiving federal funds, which is uncontested here.

relief under both statutes, so, as necessary, the Court will address the differing standards in the course of this Opinion.

## A. Plaintiff is Disabled

In order to determine whether Plaintiff is disabled under the ADA and the RHA, the Court must assess whether Plaintiff has a physical or mental impairment that "substantially limits" her in at least one "major life activity." DiCarlo v. Potter, 358 F.3d 408, 418 (6th Cir. 2004) (quoting Mahon v. Crowell, 295 F.3d 585, 589 (6th Cir. 2002), citing to 29 U.S.C. § 705(20)(B) (RHA definition) and 42 U.S.C. § 12102(2) (ADA definition)). "Substantially limits" means that an individual is either unable to perform a major life activity that the average person in the general population can perform or is significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. See 29 C.F.R. § 1630.2(j)(1); Penny v. United Parcel Serv., 128 F.3d 408, 414 (6th Cir. 1997).

Relying exclusively on Brown v. Univ. of Cincinnati, 2005 WL 1324885 (S.D. Ohio June 3, 2005), Defendant argues that Plaintiff is not disabled because "it is not reasonable to say that Plaintiff was significantly restricted in her ability to learn as

compared to the average person in the general population" (doc. 22, <u>citing</u> <u>Brown</u> at *12).  For support for its position that Plaintiff's level of achievement exceeds that which is attainable by an average, unimpaired person, Defendant points to the facts that Plaintiff earned a dual degree in Psychology and Biology from Middlebury College; that she worked as a chemical technician, clinical specialist and research assistant; that she was admitted to the University through a competitive process that required her to demonstrate academic abilities sufficient to handle the challenging curriculum; and that she was able to successfully complete her first year of medical school and, after treatment for depression, her second year (doc. 27).

In <u>Brown</u>, the plaintiff had attended medical school for over five years, and, while he performed average or better than average on his clinicals and oral exams, he had difficulty passing written, multiple choice and essay tests.  He was ultimately diagnosed with a reading disorder and a generalized anxiety disorder, and he requested that he be given extra time on exams and be allowed to take them in an environment free from distractions.  That request was denied, and he was dismissed from the program.  The <u>Brown</u> court found that the plaintiff had not adduced evidence from which a jury could reasonably find that his reading disorder substantially limited his ability to learn.  The court found it

particularly relevant that the plaintiff had excelled in high school and college and was able to receive average and above-average scores on some of his exams and determined that the plaintiff's "level of achievement greatly exceed[ed] that which the average, unimpaired individual is able to attain, so that it is not reasonable to say that [the] plaintiff was significantly restricted in the ability to learn as compared to the 'average person in the general population.'" <u>Brown</u> at *12.

The Court finds <u>Brown</u> unhelpful in its analysis of the instant matter.  As an initial matter, although Defendant implies to the contrary in its filings, <u>Brown</u> was decided by another judge in this district; it therefore has no precedential value, and the Court is not bound by its holding or rationale.  See, <u>e.g.</u>, <u>Fox v. Acadia State Bank</u>, 937 F.2d 1566, 1570 (11th Cir. 1991)("A district court is not bound by another district court's decision, or even an opinion by another judge of the same district court.").  Second, as noted by Plaintiff, <u>Brown</u> was decided prior to Congress' 2008 enactment of the Americans with Disabilities Act Amendments Act (the "ADAAA") and relies on cases that were explicitly abrogated by those amendments.  See <u>Brown</u> at *9 ("The Supreme Court has stated that the terms 'substantially limits' and 'major life activity' must be 'interpreted strictly to create a demanding standard for qualifying as disabled.' <u>Toyota Motor</u>

Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)"). With the ADAAA, Congress substantially altered how employers and courts are to evaluate ADA claims. Relevant to the case at hand, Congress expressly rejected certain holdings of the Supreme Court in Sutton v. United Air Lines, 527 U.S. 471, 489 (1999) and Toyota Motor Mfg., 534 U.S. 184, which "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect" and caused "lower courts [to] incorrectly [find] in individual cases that people with a range of substantially limiting impairments are not people with disabilities." Pub. L. No. 110-325, § 2(a)(4), (5), & (6). Thus, Congress explicitly indicated its disagreement with the Supreme Court's narrowing of the reach of the ADA and reiterated its belief that the concept of "disability" should be read broadly.

Indeed, the regulations implementing the ADAAA expressly note that the term "'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(I). While the ADAAA retains the concept that "[a]n impairment is a disability...if it substantially limits the ability of an

individual to perform a major life activity as compared to most people in the general population," it explicitly admonishes courts that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." Id. at (j)(ii), (iii). Finally, the regulations instruct that "the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." Id. at (iv). Given the above, the Court has no trouble finding that Plaintiff is disabled under the applicable statutes. Plaintiff has adduced evidence showing that ADD affects the learning processes in such a way that someone with ADD cannot perform at the level that might be otherwise expected and that it causes problems with focus, attention, organization and inhibitory control. Specific to Plaintiff, the evidence put forth shows that Plaintiff's ADD affected her ability to learn and retain new information and that she struggled more than the average person with organizing her thoughts and registering information. In short, the record

supports a finding that Plaintiff is substantially limited in her ability to learn because of her ADD. The facts that she graduated from Middlebury with a dual degree and that she was able to succeed in part in medical school do not change the Court's decision, as these facts merely indicate that she was able to achieve some measure of success despite her disability-they do not speak to her learning ability as compared with the average person. The only evidence in the record that speaks to that is Dr. Krikorian's assessment, which supports a finding of disability. Defendant's rationale-that anyone who has had some modicum of academic success cannot be found to have a disability that affects learning–flies in the face of Congress' directives and the relevant implementing regulations. The Court cannot endorse Defendant's rationale, and Defendant has presented no compelling or controlling reason why the Court must.

The Court thus finds that Plaintiff is disabled under the ADA and the RHA due to her ADD.

## B. Plaintiff is Otherwise Qualified

A disabled person is "otherwise qualified" to participate in a program if she can meet its necessary requirements with reasonable accommodation. Kaltenberger v. Ohio College of Podiatric Medicine, 162, F.3d 432, 435-36 (Sixth Cir. 1998), citing Sandison v. Michigan High Sch. Athletic Ass'n, Inc., 64

F.3d 1026, 1034 (6th Cir. 1995).

As the <u>Kaltenberger</u> court noted, "discrimination laws do not require 'an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person….' '[W]hile a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones…." <u>Kaltenberger</u>, 162 F.3d at 436 (internal citations omitted). Defendant argues that Plaintiff is not "otherwise qualified" to participate in its medicine curriculum because her requested accommodation—to retake the pediatrics exam—would require Defendant to fundamentally alter its curriculum.

However, the Court finds that Plaintiff has demonstrated that a genuine dispute of material fact exists with respect to this issue. Specifically, Plaintiff notes that Dean Stern, who ultimately made the decision to terminate Plaintiff from the program, had full discretion regarding that decision. That is, when assessing whether Plaintiff's requested accommodation-to retake the pediatrics exam and continue in the program—should be granted, he was not bound by rules, policies, procedures or curriculum mandates. As Plaintiff observes, Dean Stern had repeatedly allowed students to continue in the program despite academic challenges that had led to recommendations of dismissal.

Indeed, Plaintiff herself had benefitted from Dean Stern's discretion earlier in her career at the University.

Not only was Dean Stern not bound by any curriculum standards or policies when he decided to terminate Plaintiff from the program, nothing in the record supports the notion that he even considered the issue of whether granting her request for accommodation would alter—let alone fundamentally alter-the program or its standards.

On the contrary, Dean Stern testified in deposition that he denied Plaintiff's requested accommodation because of "a pattern of academic and psychiatric difficulties." Consequently, a rational jury could find that Plaintiff's request to retake the pediatrics exam was reasonable and would not have corrupted Defendant's standards.

In addition, Defendant argues that it is entitled to summary judgment because its decision to terminate Plaintiff from its program is entitled to deference by the Court. The Kaltenberger court explained that

> when reviewing the substance of academic decisions, courts "should show great respect for the faculty's professional judgment…." "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation…." Courts must also give deference to professional academic judgments when evaluating the reasonable accommodation requirement. Kaltenberger, 162 F.3d at 436 (internal citations omitted).

However, this deference is not absolute, and the Court is tasked with ensuring that the discretion to make academic judgments not be used to mask discrimination. Here, Plaintiff has presented evidence that creates a genuine dispute as to this issue. Specifically, it appears that Dean Stern did not consider Plaintiff's medical records, Dr. Krikorian's report and associated materials, or Plaintiff's own explanatory letter of appeal when he made his decision to terminate Plaintiff from the program. Similarly, it appears that he did not speak to Plaintiff, to Dr. Krikorian, to the Senior Associate Dean of Student Affairs and Admissions or to the Assistant Dean for Academic Support—both of whom had worked extensively with Plaintiff-prior to making his decision. In his deposition, Dean Stern stated that he could not even recall whether he knew that Plaintiff had been diagnosed with ADD at the time he denied her request for accommodation.

Given the state of the record evidence, the Court cannot pay deference to Dean Stern's decision. Plaintiff has adduced evidence from which a reasonable jury could find that Dean Stern failed to actually consider the effect of Plaintiff's ADD on her academic performance; her request for an accommodation for her disability; whether any alternatives were available that might have allowed Defendant to accommodate Plaintiff's disability; and

whether accommodating her request would have allowed her to complete the program without, as noted above, fundamentally altering the program's standards. See, e.g., Wong v. Regents of Univ. of Cal., 192 F.3d 807 (9th Cir. 1999). Plaintiff has created a genuine dispute as to whether Dean Stern's decision was reached after thoroughly considering Plaintiff's request for accommodation.

Consequently, summary judgment on the issue of whether Plaintiff was otherwise qualified to continue in the program would be inappropriate.

## IV. Plaintiff's Specific Claims

### A. Plaintiff's Failure-to-Accommodate Claims Survive

In Counts 1 & 2 of Plaintiff's Complaint, she claims that Defendant violated Title II of the ADA and Section 504 of the RHA when it refused to allow her to retake the pediatrics exam, which Plaintiff contends was a request for an accommodation for her disability (doc. 1). The failure to provide reasonable accommodations can constitute disability discrimination. See Alexander v. Choate, 469 U.S. 287, 295 (1985); Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 601 (1999); Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 868 (6th Cir. 2007).

As discussed above, under the circumstances present here, a

rational jury could find that Plaintiff's request to retake the pediatrics exam was a reasonable request to accommodate her ADD. Therefore, these claims survive summary judgment.

**B**                                                                    .

**Discrimination on Account of Actual Disability**

Even if Plaintiff is disabled and otherwise qualified, Defendant argues that it is nonetheless entitled to summary judgment because Plaintiff was not terminated from its program solely because of her disability but, instead, because she failed to meet the minimum academic standards for its program (doc. 22, citing Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1185-86 (6th Cir. 1996)).  Defendant contends that it applied its neutral academic standards to Plaintiff's situation and that she simply failed to meet the requirements.

Whether the Court applies the "solely because of" causation language of the RHA or the "but for" analysis of the ADA, the Court finds that summary judgment is not appropriate here.  As discussed above, Plaintiff has adduced evidence showing a genuine dispute regarding whether she was actually terminated, as Defendant claims, because of her failure to meet the academic standards, given that those standards were flexible and could be overridden based on Dean Stern's discretion.  Especially in light of Dean Stern's comment that Plaintiff was dismissed because of

"a pattern of academic and psychiatric difficulties," a reasonable jury could find that Defendant's ex post facto assertion that she was dismissed for failure to meet the standards was not the real reason for her dismissal and that, instead, she was dismissed because of—or would not have been dismissed but for-her disability.

## C. Discrimination on Account of Perceived Disability

In addition to prohibiting discrimination based on actual disabilities, both the ADA and the RHA prohibit public entities from discriminating against people because they are perceived—or regarded-as disabled. <u>See</u> 42 U.S.C. §§ 12102(2). Relevant to the instant matter, an individual may fall within the ambit of this "regarded-as disabled" prong of the statutes where a covered entity mistakenly believes that the person has a physical or mental impairment and consequently discriminates against her. <u>See</u>, <u>e.g.</u>, <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 489 (1999)(superseded by statute on other grounds); 42 U.S.C. § 12102(3)(A). When evaluating a regarded-as claim, the Court looks not to the individual crying foul but to the state of mind of the entity against whom she makes her claim. This is a question, therefore, of intent. <u>Ross v. Campbell Soup Co.</u>, 237 F.3d 701, 706 (6th Cir. 2001). Consequently, such a claim is

"rarely susceptible to resolution at the summary judgment stage."

Id.

This case does not present one of those rare times when summary judgment can properly resolve a question of motive. On the contrary, Plaintiff has adduced evidence showing a genuine dispute over Defendant's motive in terminating Plaintiff's matriculation in its medical studies program. For example, the Senior Associate Dean of Student Affairs and Admissions and the Chair of the Appeal Board that recommended Plaintiff's dismissal both decided that Plaintiff's history of depression was relevant to whether she would make a good physician. And Dean Stern testified that Plaintiff had "a constellation of mental health disorders" and "psychiatric difficulties" that he believed would preclude her from finishing the program and becoming a good physician. Given the evidence in the record, and given that the germane issue here is Defendant's state of mind at the time Plaintiff was terminated from the program, the Court finds that summary judgment on Plaintiff's regarded-as claim is inappropriate because, for example, a reasonable jury could find that Plaintiff was impermissibly terminated from the program because she was mistakenly thought to have "a constellation of psychiatric problems" or to have incapacitating depression.

**V. CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment (doc. 22) is DENIED, and this matter is set for a final pretrial conference for October 11, 2012, at 11:00 A.M., with trial to begin on November 13, 2012.


   SO ORDERED.

Dated:  September 6, 2012 <u>/s/ S. Arthur Spiegel</u>
                          S. Arthur Spiegel
                          United States Senior District Judge